### BENNETT BROS. LUMBER CO. v. ROBINSON.

(Circuit Court of Appeals, Sixth Circuit. March 11, 1908.)

No. 1,746.

CARRIERS—LIEN—FREIGHT ADVANCED.

An owner of lumber delivered it at a lake port to a lumber company under an agreement that the latter should ship the same to another port and market it, advancing freight and the expenses of loading, unloading, piling, and reshipment, for which it was to reimburse itself when the lumber was sold. The company shipped the lumber to Sandusky, and on its arrival procured a railroad company to receive it, pay the lake freight, and transport it to its yards, where it was piled for reshipment as sold. *Held*, that the railroad company, having acted in good faith in receiving the lumber as a connecting carrier, was subrogated to the lien of the lake carrier for the freight advanced as well as to the rights of the lumber company as agent for other advances.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 9, Carriers, § 897.]

Appeal from the Circuit Court of the United States for the Eastern Division of the Southern District of Ohio.

A. W. Smith, for appellant.

Lawrence Maxwell, for appellee.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge. This was a suit brought by the receiver of the Columbus, Sandusky & Hocking Railroad Company against the Bennett Bros. Lumber Company for lake charges advanced by the railroad company on lumber shipped by lake by one Putnam, from Bayfield, Wis., to Sandusky, Ohio (for which it claims a lien), and for certain loading, switching, and storage charges on such lumber. This lumber consisted of 2,000,000 feet, and, belonging to Putnam, was in July, 1896, piled on the docks at Bayfield. On the 16th of that month Putnam made a contract in writing with the Toledo Lumber & Manufacturing Company for the purpose of procuring the services of the latter as a commission merchant to sell the lumber. Putnam agreed to furnish the lumber company, on the docks at Bayfield, all of his lumber then piled thereon, to be by it sold for him as provided in the contract. The lumber company agreed to receive all of said lumber at the docks, as the agent of Putnam, "and ship the same to Toledo or Sandusky, Ohio, and there pile it, separate from all other lumber, and mark each pile as follows: 'A. C. Putnam.'" The lumber company agreed to advance the freight charges from Bayfield to Toledo or Sandusky, to advance the expenses of loading and unloading, piling, and reshipping, and all other sums necessary to ship and sell said lumber; to advance such sums as may be necessary to keep said lumber fully insured—which insurance shall be made payable "to Putnam, and to use due diligence in selling said lumber." The lumber company further agreed to furnish Putnam, on the 10th of each month, an account of all the lumber by it sold, and to pay over the proceeds of the lumber sold the preceding 30 days. Putnam agreed to pay over to the lumber company as its compensation "all such sums as may be realized from the sale of said lumber, after deducting all advances by it made for freight and other expenses incident to handling said lumber, including insurance, and after deducting the further sum of $10.25 per thousand feet for merchantable lumber, 12 feet and upward in length, and $5.25 per thousand feet for all mill cull." It was further mutually agreed that the lumber company should not sell the lumber at a price that would not net to the owner thereof the said sums of $10.25 per thousand feet for the merchantable portion of said lumber, and $5.25 per thousand feet for the mill cull.

Under the contract, in August, 1896, the lumber in question was shipped in barges from Bayfield to Sandusky. It was shipped by and in the name of Putnam to the lumber company as assignee for the account of Putnam. The representative of the lumber company at Sandusky was one Koch. He was to market the lumber for a share of the commission. He received the bills of lading, but neither he nor the lumber company was able to advance the money to pay the lake freight and thus secure a delivery. Under these circumstances he made an arrangement with the Columbus, Sandusky & Hocking Railroad Company, which had a terminus in Sandusky, to load the lumber into cars, switch it to certain yards owned by the railroad company, and there store it until it could be sold and billed out. Koch had the privilege of doing the loading and unloading, for which the railroad company was to allow him $2 per car. The railroad company was to do the switching

and furnish the storage free of charge. This was done for the sake of getting the freight; the understanding being that, when the lumber was sold and billed out, there should be added to the freight charges for rail transportation on each car a proportionate part of the lake freight charges, which should be paid by the purchaser of the lumber, and in this way the railroad company would be reimbursed for the amount advanced by it to pay lake freight. About one-third of the lumber was sold and billed out during the summer and fall of 1896. There is a credit of $90 given by the railroad company for the reimbursement of lake freightage advanced during this time.

With things in this condition, in 1896 the lumber company became insolvent, and a receiver was appointed. On December 1, 1896, the railroad company brought its action in the state court against Putnam for $2,917.29, on account of the lake freight advanced by it. An order of attachment against Putnam as a nonresident was levied on the lumber in question then in the hands of the railroad company. Thereupon Putnam removed his case to the court below. He was desirous of giving a redelivery bond and regaining possession of the lumber; but the attorneys for the railroad company advised him that, although he gave the bond, the railroad company would not handle his cars, nor allow any one to trespass upon its property, for the purpose of switching them, unless its claim for freight advanced was paid. The railroad company passed into the hands of a receiver, and Putnam sold his lumber en bloc to the Bennett Bros. Lumber Company, giving the latter a bond to indemnify it against the claim of the railroad company. Thereupon, on August 28, 1897, the Bennett Bros. Lumber Company filed a petition in the foreclosure case for an order directing the receiver to deliver the lumber to the petitioner "upon such terms and conditions as may be equitable and proper." The court allowed the petition and ordered the receiver to turn over the lumber to the petitioner upon the delivery to him of a bond in the sum of $5,000, "conditioned that said petitioner shall pay or cause to be paid to said receiver all moneys that shall finally be adjudged to be due said receiver on the said petition." In the order it was stated that the lien, if any, of the receiver for the charges in dispute, if any, should not be affected by the order. A bond was accordingly delivered, and the lumber was delivered to the Bennett Bros. Lumber Company as prayed. Then, on September 16, 1897, the receiver filed a petition in the same case for the purpose of determining the validity of the lien, and requiring the Bennett Bros. Lumber Company to pay the amount thereof. The court, after hearing the parties, decreed that the receiver recover from the Bennett Bros. Lumber Company the amount of said lake freight and other charges. From that decree, the present appeal is taken.

It is contended by the present owners of the lumber that Koch had no authority to pledge it for the advances made by the railroad company of the lake freightage, that the railroad company had no power to do this itself, and that the payment by the railroad company of the lake freightage extinguished the lien, although the court below held that it passed to the railroad company by subrogation. It is contended that there was a definite transportation from Bayfield to San-

dusky, that it ended at Sandusky, and when the lake carriers were paid their lien on the lumber for their freight was extinguished. The railroad was not a connecting line, the lumber might or might not go over its road, and, if it did, it was under a new transportation. Thus the matter resolves itself, even in the view taken by counsel for the purchaser of the lumber, into a question of the authority under the contract, express or implied, and the reasonableness of the action of the railroad company in advancing the lake charges on the strength of thus acquiring a lien to secure its reimbursement.

We do not think this is a case where Putnam entered into a contract limited to the shipment of the lumber to Sandusky, with no expectation of shipping it farther. The contract contemplated the procuring of the services of the lumber company as a commission merchant to sell the lumber. For that purpose the lumber was to be shipped to the selling point. Sandusky was only a point en route. There the lumber company was to separate the lumber from all other lumber and mark each pile "A. C. Putnam." The contract provided that the lumber company should advance the freight charges to Sandusky, but also should advance the expenses of loading and unloading, piling and reshipping, and all other sums necessary to ship and sell the lumber, as well as to advance such sums as might be necessary to keep the lumber fully insured. This covers all the charges included in this case, and clearly looks to the advancement of lake freightage, as well as all items of storage, loading, and unloading, etc. But it does further than that. While it provides for the advancement by the lumber company of all these charges, it contemplates their reimbursement and ultimate payment by Putnam; for he agrees to pay the lumber company as its compensation "all such sums as may be realized from the sale of said lumber, after deducting all advances by it made for freight and other expenses incident to handling said lumber including insurance, and after deducting the further sum of $10.25 per thousand feet for merchantable lumber, 12 feet and upward in length, and $5.25 per thousand feet for all mill cull." In other words, the lumber company was made his agent to market the lumber, ship it, and sell it, advance the freightage and other incidental expenses, and deduct the same, reimbursing itself and accounting for the proceeds at a stipulated rate.

While it does not appear that the railroad company knew the specific terms of the contract, the conduct of the parties who handled the lumber and placed the same in its cars gave reasonable ground to believe that it was only doing what Putnam expected and desired when it paid the lake freightage and stored the lumber in its cars, awaiting a sale and expecting reimbursement. In the case of Wabash R. R. v. Pearce, 192 U. S. 179, 24 Sup. Ct. 231, 48 L. Ed. 397, it was held a railroad company had a lien for the duties paid by it on imported goods which passed over its line in transit. Mr. Justice Brewer, who delivered the opinion, cited and quoted a number of authorities, including Overton on Liens, § 135, page 166, Hutchinson on Carriers, § 478a (being section 867 of the third edition), Ray on Freight Carriers, § 104, and Schouler on Bailments, p. 544. From the latter he quotes (192 U. S. 187, 24 Sup. Ct. 233 [48 L. Ed. 397]):

159 F.—58

"A common carrier, then, may usually retain particular goods, by virtue of his lien right, until the freight and charges due thereon for his whole transportation are paid or tendered him, and he cannot be compelled to give them up sooner. This lien, moreover, extends to all the proper freight and storage charges upon the goods throughout the whole of a continuous transit over successive lines, since the last carrier or final warehouseman may advance what was lawfully due his predecessors and hold the property as security for his reimbursement."

To the same effect is Bowman v. Hilton, 11 Ohio, 303, 305, in which the court sustained the lien of the warehouseman for the freight charges advanced by him on goods delivered by the carrier, saying:

"By the usages of the trade he became, for the purposes of paying charges and receiving and forwarding from Brunnersburg to Williams Center, the agent of the plaintiff, and his lien attached for the moneys expended in an honest endeavor to discharge his duty. Liens of this kind are said to be favored in law, and are not subject to the objections against general liens."

See, also, and especially, Vaughan v. R. R. Co., 13 R. I. 578; Evans & Hollinger v. R. R. Co., 76 Mo. App. 472.

Judgment affirmed.

NOTE.—The following is the opinion of Sater, District Judge, in the Circuit Court:

SATER, District Judge. This proceeding is brought by the receiver of the Columbus, Sandusky & Hocking Railroad Company to recover freight advancements to the owner of lake vessels and charges for unloading, loading, switching, and storage of lumber shipped from Bayfield, Wis., to Sandusky, Ohio. The Bennett Bros. Lumber Company dispute the entire claim, excepting a portion of the storage charges. On an application made to this court the lumber, which was stored on the premises of the railroad company, was surrendered to the Bennett Bros. Lumber Company on their execution and delivery of a bond to protect the receiver. The Toledo Lumber & Manufacturing Company (hereinafter called the "Lumber Company"), in its contract with Putnam, stipulated as his agent to receive certain lumber owned by him at the docks at Bayfield, Wis., and ship the same to Toledo or Sandusky, Ohio, and there pile it separate from all other lumber and mark each pile "H. C. Putnam." It agreed to pay all freight charges, the expense of loading, unloading, piling, reshipping, insurance, and all other sums necessary to ship and sell the lumber, and on the 10th day of each month to furnish an account to Putnam for the lumber sold by it, and deliver to him at that time, or as soon thereafter as settlements with customers could be had, cash or good negotiable paper representing the proceeds of all lumber sold during the preceding 30 days. Putnam agreed with the Lumber Company to pay it as his agent for its compensation all sums realized from the sale of lumber, after deducting therefrom the freight payments, insurance, expense incident to the handling of the lumber, $10.25 per thousand feet for all merchantable lumber 12 feet or more in length, and $5.25 per thousand feet for mill culls. The Lumber Company had the privilege of purchasing the lumber at any time by paying in cash or in notes acceptable to Putnam.

There is no evidence that the shipper who carried the lumber to Sandusky, Ohio, or any of the officers of the railroad company, had knowledge of the terms of the contract. Putnam consigned the lumber to the Lumber Company as if purchased from him. It was in fact his individual property. The lake carrier acquired a lien for the cost of transportation from Bayfield to Sandusky, and Putnam, as well as the Lumber Company, became liable for such lien. 6 Cyc. 500, 501. The lumber, when unloaded from the vessels, was piled on the docks by the railroad company and transported then by it from one-half to three-fourths of a mile to its yards, where it was piled, and each pile was marked in such a way as to designate Put-

nam's ownership. The railroad company advanced the money to pay the lake freight, and the bills of lading were delivered to it.

The railroad company's agent. Odenbaugh, and Koch, the Lumber Company's agent, differ in their testimony as to the circumstances leading up to the railroad company's advancement of the money to pay the lake freight. Koch testifies that what was done in payment of lake freight was in pursuance of a course of dealing then and theretofore existing between the railroad company and himself. Odenbaugh testifies the payment was made in consequence of an agreement between him and Koch, who claimed to be Putnam's agent. The railroad company, in either event, acquired a lien on the lumber. Hutchinson on Carriers (3d Ed.) § 867; Caye v. Pool's Assignee, 108 Ky. 124, 55 S. W. 887, 94 Am. St. Rep. 348, 49 L. R. A. 251; Kansas City Transfer Co. v. Neiswanger, 18 Mo. App. 103; Moore on Carriers, p. 432. There was not a new pledging of the property or the creation of a new lien. The amount of the railroad company's advance payments was to be returned to it as a freight charge, as the lumber was sold. The railroad company acted in good faith. Putnam, retaining the ownership of the property, constituted the Lumber Company his agent, and that agent, through Koch, such an instrumentality as it might rightfully invoke to aid it in its business transactions, was clothed with such apparent authority at least to act for Putnam that a lien upon the lumber for the charges of transportation passed to the railroad company. Hutchinson on Carriers, § 885; Vaughan v. Prov. & Worces. R. R. Co., 13 R. I. 580. The railroad company was subrogated to the rights of the lake carrier. Sheldon on Subrogation, § 10; Jones on Liens, § 289; Evans & Hollinger v. C. & A. Ry. Co., 76 Mo. App. 475; 5 Am. & Eng. Ency. of Law, 414. The subsequent delivery of a portion of the goods on which the railroad company had a lien for freight did not discharge the lien for the entire freight on the portion not delivered, or even pro tanto. Moore on Carriers, pp. 441, 442. The lien remained, unless waived by the hereinafter noted attachment proceedings, to the full extent to which it was unpaid on the property delivered to the Bennett Bros. Lumber Company. The Lumber Company failed, and a receiver was appointed for it. The contract between it and Putnam, then partly executed, was canceled. The Bennett Bros. bought the lumber of Putnam and took a bond to indemnify them against the claim of the railroad company. The railroad company refused to permit the Bennett Bros. to take possession of or remove the lumber until its claims for freight, storage, switching, loading, and unloading were paid.

The railroad company, having commenced a suit in attachment in the state court to recover the amount of the freight advanced by it and still remaining unpaid, and having attached the lumber in question, it is urged that it waived its lien by pursuing a remedy inconsistent with its enforcement. The Bennett Bros. Lumber Company, in its application filed in this court on the 28th day of August, 1897, recites that "it is ready and willing, and now offers, to pay or cause to be paid all reasonable charges for storage upon said lumber from the 26th day of November, 1896, to the present time, but that it is unable to agree with said receiver as to the proper amount to be paid therefor." The railroad company claims a lien, not only on account of freight advanced to the shipowner, but for storage also, and the Bennett Bros. admit the existence of this last lien from the 26th day of November, 1896. The railroad company attached on account of only one of the liens. The other lien began to run prior to the date of the attachment. The lumber, when attached, was in possession of the railroad company, and so continued until surrendered to Bennett Bros. under an order of this court. There was never a time after the railroad company paid the lake freight that it did not assert a lien therefor. The sheriff had such possession only of the property as his writ of attachment gave. While the attachment suit was still pending, both parties herein invoked the jurisdiction of this court to determine their respective rights; the attachment suit being held in abeyance pending this present proceeding. It is urged that by attaching, the railroad company waived its lien.

The lien for storage was not only a different lien from that for the freight, but it was a superior lien. Moore on Carriers, p. 440; Powers & Co. v.

Six Tons of Marble, 21 La. Ann. 402. The affidavit in attachment did not allege that the railroad company has no lien, as was done in Wingard v. Banning, 39 Cal. 543; nor was the property disposed of under the attachment lien; nor did the railroad company, by virtue of its attachment, divest itself of the power of restoring the property to Putnam or his vendee. In fact, it has delivered the property to Putnam's vendee. It may fairly be said that, in so far as the sheriff held the property, he held it for the railroad company, which had a lien also for storage. The intention was manifest all the while on the part of the railroad company not to yield its lien or surrender the lumber until it was paid in full. A proceeding in attachment does not always waive a lien. Palmer v. Tucker, 45 Me. 316. Other cases are Whitaker v. Sumner, 20 Pick. 399; Townsend v. Newell, 14 Pick. 332; Roberts v. Wilcoxson & Rose, 36 Ark. 355; Calkins v. Lockwood, 17 Conn. 155, 42 Am. Dec. 729. The attachment proceeding was not an abandonment of the lien of the railroad company. (Then follows a discussion of charges for loading, unloading, and switching.)

An order may be drawn in accordance with the foregoing.